# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **H.M., J.P., A.L., K.T., J.G., and C.L.** | |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| **UNITED STATES OF AMERICA,** | |
| SERVE: | |
| Federal Tort Claims Act Section | |
| Tort Branch, Civil Division | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| U.S. Attorney's Office | |
| Civil Process Clerk | |
| 555 Fourth St. NW | |
| Washington, DC 20530 | |
| | |
| U.S. Attorney General Bondi | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| **and** | |
| | |
| **BETH REESE, in her individual capacity,** | |
| Bureau of Prisons | |
| Central Office HQ | |
| 320 First Street, NW | |
| Washington, DC 20534 | |
| | |
| *Defendants*. | |

## COMPLAINT

### INTRODUCTION

1. Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.[1] are six individual women who were sexually abused, raped, and harassed by Officer Danny Franco, one of a long line of Federal Medical Center Carswell ("FMC Carswell") officers, who was able to sexually abuse women—oftentimes daily—under his custody with impunity.

2. Sexual predators have been free to prey upon incarcerated women whose safety they were tasked to ensure due to failures throughout the BOP's chain of command, especially at the Office of Internal Affairs, which has repeatedly failed to adequately investigate officers for sexual abuse, including Officer Franco's overt and obvious sexual abuse of at least these six women.

3. The BOP leadership, including Ms. Reese, has been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting sexual abuse by officers for years—and yet has done nothing to meaningfully respond or otherwise protect the people incarcerated there.

4. As a direct result of these failures, Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. were sexually assaulted and raped, some suffering from daily abuse over the course of months or years, then threatened with retaliation if they were to report the abuse.

5. Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. each suffer from ongoing trauma symptoms because of the sexual violence, mental torment, and retaliation, including insomnia, chronic nightmares, anxiety, flashbacks, and depression.

---

[1] Plaintiffs are concurrently filing a motion to proceed under pseudonyms for fear of retaliation.

6.   Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq*., in connection with the deficient supervision and custodial care provided to them by various personnel, including Officer Franco, and the Officer of Internal Affairs, within the scope of their employment with the BOP. Plaintiffs seek redress for Defendants' unlawful conduct, which caused them to suffer permanent and catastrophic injuries, and which could have and should have been prevented.

7.   Plaintiffs also bring this suit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), in connection with Defendant Reese, as Chief of the Office of Internal Affairs, failing to protect Plaintiffs from reasonably foreseeable predators such as Franco, despite constructive knowledge of his predation, and thereby participating in, and facilitating, the harboring and transportation of Plaintiffs for the purposes of sex induced by force and coercion, and benefiting by continued employment through the BOP.

## JURISDICTION AND VENUE

8.   This action involves claims arising under United States and District of Columbia laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

9.   Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

## PARTIES

10.   Plaintiff H.M. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell, where she currently resides.

11.  Plaintiff J.P. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell. She was released from BOP custody in June 2023 but remains on supervised release. She resides in Arkansas.

12.  Plaintiff A.L. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell. She is currently incarcerated at FCI Aliceville in Alabama.

13.  Plaintiff K.T. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell. She was released from BOP custody in October 2024 but remains on supervised release. She resides in Texas.

14.  Plaintiff J.G. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell. She is currently incarcerated at FCI Waseca in Minnesota.

15.  Plaintiff C.L. was, at all times relevant here, incarcerated in BOP facilities, including FMC Carswell, where she currently resides.

16.  The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiffs' claims under the FTCA. The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

17.  The BOP is a component of Defendant United States's Department of Justice. The BOP operates and is in possession and control of the Federal Medical Center Carswell. FMC Carswell is a federal female medical correctional institution providing special medical and mental health care.

18.  At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FMC Carswell, and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including, but not limited to, Officer Franco and Defendant Reese, and the operation of the Office of Internal Affairs which is supposed to investigate staff misconduct.

19.  Defendant Beth Reese is Chief of the Office of Internal Affairs for the BOP.

20.  She has held that role since May 2018.

21.  Her duty station is in the Central Office in Washington, DC.

22.  As chief of the Office of Internal Affairs, Ms. Reese is tasked with overseeing and properly responding to allegations of staff misconduct.

23.  She has responsibilities for ensuring that investigations conducted by her office move forward and are completed in a timely manner.

24.  These responsibilities include, but are not limited to, training and policy development regarding the office's handling of sexual misconduct allegations, reviewing retaliation allegations and determining whether to have a local investigator or someone from the Central Office further review the matter, reviewing local allegations and referring it to the appropriate local OIG field office, and tracking and maintaining awareness of investigations handled by the OIG.[2]

---

[2] Transcript of Evidentiary Hr'g at 25, 28, 37, 59, 61, *Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons*, (2024) (No. CV 23-04155-YGR).

25. While acting and failing to act as alleged herein, Defendants had complete custody and total control of H.M., J.P., A.L., K.T., J.G., and C.L.

26. H.M., J.P., A.L., K.T., J.G., and C.L. were dependent upon Defendants for their personal security and necessities.

27. In performing the acts and omissions contained herein, Defendants, and each of its employees, acted under color of federal law, maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiffs. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiffs and to their constitutionally, statutorily, and common law-protected rights. Despite this knowledge, Defendants failed to take steps to protect Plaintiffs and to ensure their rights to safety from sexual assault.

28. Defendants are liable for the tortious acts of their employees as well as the negligent failure to properly investigate. At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant. At all times relevant hereto, each Defendant, as well as Officer Franco, was acting within the course and scope of said agency, representation, or employment and was within the scope of their authority, whether actual or apparent. At all times relevant hereto, each Defendant was the authorized agent, partner, servant, or contractor of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of the United States and Defendant Reese. Accordingly, each of them is jointly and severally liable to Plaintiffs.

## THERE IS A KNOWN AND LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL

29.    Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

30.    This documentation was known to the Defendants.

31.    Most recently, the DOJ's own internal investigations, following the revelation of rampant abuse at FCI Dublin, identified that nearly two-thirds of BOP facilities have documented sexual abuse allegations, including FMC Carswell.[3]

32.    None of this documentation, however, is new.

33.    In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody.*"

34.    That Amnesty Report detailed:

> Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[4]

35.    The Amnesty Report was widely circulated and read by responsible corrections professionals.

---

[3] U.S. Senate Permanent Subcommittee on Investigations, "Sexual Abuse of Female Inmates in Federal Prisons" (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 88.

[4] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

36.　The Amnesty Report found that FMC Carswell in particular "has been plagued with systemic sexual abuse for years," revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.

37.　FMC Carswell is the only federal BOP medical and psychiatric facility in the country for women. It houses people requiring more intensive medical care, people with mental and physical disabilities, and people who are unable to take care of their own medical needs, a population especially vulnerable to sexual abuse. Given the vulnerability of people with intensive medical needs, Defendants should have taken extra care to ensure the protection of those within FMC Carswell.

38.　Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

39.　Two lawsuits were filed by two women related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.

40.　FMC Carswell staff witnessed Nix take women to isolated areas of the prison, outside the view of cameras, but failed to intervene.[5]

41.　In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of five counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[6]

---

[5] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA News, Mar. 11, 2024, https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

[6] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

42.    In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[7]

43.    One prisoner reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[8]

44.    From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Officer Franco raped Plaintiffs.[9]

45.    In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody. She reported him, but faced constant retaliation. He was convicted in 2017.[10]

46.    In 2021, Lieutenant Luis Curiel sexually abused three women. He was reported in June or July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners. He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women

---

[7] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[8] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[9] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

[10] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

under his custody at FMC Carswell. As a lieutenant, he supervised other officers, thereby demonstrating that this behavior was not only acceptable, but was permitted by Defendants.[11]

47.    A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation. This same officer had previously reported a lieutenant for exchanging drugs for sex and was subsequently retaliated against and fired. [12]

48.    In the PREA (Prison Rape Elimination Act) Audit Report at FMC Carswell conducted in the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[13]

49.    From 2014 to 2018, 35 women at the FMC Carswell reported sexual abuse from staff members. This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin.[14]

50.    The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

51.    Undersigned counsel alone represents nine women who reported sexual abuse at FMC Carswell, who are not represented in the number above.

---

[11] *See United States v. Luise Curiel*, 4-22-cr-00132 (N.D.T.X) 2022.

[12] *See*, supra, 4

[13] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

[14] The widespread sexual abuse at Dublin is documented in *California Coalition for Women Prisoners, et al. v. United States*, Case No. 4:23-cv-415%-YGR (N.D. Cal.).

52. Likewise, upon information and belief, a paramedic working at FMC Carswell was walked off as recently as October 2025 after being reported for sexually assaulting at least three women.

53. Despite the audits, lawsuits, and criminal referrals, the abuse has continued, and Defendants failed to take appropriate action to prevent future abuse, such as that experienced by Plaintiffs, and continued to allow male staff to spend a significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.

54. The culture of sexual abuse whereby Defendants failed to investigate allegations of sexual abuse, document, track, or reprimand known sexual predators, and otherwise monitor and protect prisoners at FMC Carswell—and across BOP facilities— directly led to Plaintiffs' abuse.

## DEFENDANTS KNEW OF, AND FAILED TO PROPERLY ADDRESS, SEXUAL VIOLENCE RAMPANT ACROSS THE BOP

55. However, sexual abuse by staff at BOP women's prisons has not been limited to FMC Carswell.

56. It occurs across BOP facilities throughout the country.

57. Despite the knowledge that correctional staff sexually abuse prisoners in their custody, Defendants continue failing to take appropriate steps to protect those in their custody.

58. In 2007, five former corrections officers were convicted on criminal charges relating to the sexual abuse of female prisoners at FCI Tallahassee.

59. A 2021 lawsuit filed by four plaintiffs revealed sexual abuse by an FCI Tallahassee physician assistant.[15] Before this action, the same physician assistant was named in at

---

[15] Compl. at 1, *Batchelor et al v. Rolston et al*, No. 4:21-cv-00232-AW-MAF (N.D. Fla. June 4, 2021).

least four civil suits alleging sexual abuse.[16] Another former officer at FCI Tallahassee received a two-year prison sentence for the sexual abuse of a prisoner.[17] The victim in this case also filed a civil lawsuit, which named a second FCI Tallahassee guard accused of abuse, which settled in 2022.[18]

60.   An investigation published by the Associated Press in 2021 documented that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at a Kentucky prison medical center who threatened prisoners' lives if they didn't comply with sexual abuse. [19]

61.   The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[20]

62.   In 2022, a different former corrections officer at FCI Tallahassee was sentenced to prison for four years for the sexual abuse of a prisoner while working at the facility. His indictment included charges related to multiple prisoners.[21]

---

[16] *Id.*

[17] Press Release, United States Attorney's Office for the Northern District of Florida, Former Bureau of Prisons Correctional Officer Sentenced to 24 Months in Federal Prison For Sexually Abusing Inmates (Aug. 27, 2021), https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[18] Silja Talvia, *Women Report 'Rampant' Sexual Abuse at Federal Prison Where Ghislaine Maxwell is Held,* THE APPEAL, Apr. 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/.

[19] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[20] *Id.*

[21] Christopher Cann, *Former Tallahassee correctional officer sentenced to 4 years in prison for sexually abusing inmate*, TALLAHASSEE DEMOCRAT, Mar. 11, 2022,

63.    In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct by looking at the "hundreds of [incidents of] sexual abuse perpetrated by its employees over the previous five years."[22]

64.    The working group noted long-standing, pervasive problems throughout the BOP that needed fixing. This working group learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[23]

65.    Additionally, it determined that there needed to be changes to the "culture and environment in BOP facilities" to address the rampant sexual violence.[24]

66.    The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

---

https://www.tallahassee.com/story/news/2022/03/11/former-tallahassee-correctional-officer-sentenced-4-years-prison-for-abusing-inmate-leon-county/6984207001/.

[22] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf (Working Gp. Rep.).

[23] *Id*.

[24] *Id*.

67. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

68. One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

69. This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements runs counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

70. Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[25]

71. The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[26]

72. The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

---

[25] *Id.*

[26] *Id.*

73. Additionally, the working group recommended that the BOP develop an "early warning system" in order to detect signs that staff may be engaged in sexual conduct and to identify abusers with a history of abuse.

74. This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit without any systemic tracking or identification.

75. Had the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, been in place before 2021, H.M., J.P., A.L., K.T., J.G., and C.L. likely would have been saved from these frequent, violent assaults.

76. In October 2022, the DOJ Office of the Inspector General issued a Management Advisory Memorandum detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations. [27]

77. The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [28]

78. The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their

---

[27] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[28] *Id.*

interactions with inmates because such staff members may act without fear of disciplinary consequences." [29]

79.    The report explained that the "OIG has serious concerns that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees." [30]

80.    In sum: "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP." [31]

81.    Over the last three years, more evidence of sexual abuse in the BOP has surfaced.

82.    In 2022, a jury convicted a former prison warden at another federal facility afflicted by allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through 2021 and of making false statements to a government agency in the investigation of criminal acts. Separate from the warden's own sexually abusive behavior, eight FCI

---

[29] *Id.*

[30] *Id.*

[31] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[32]

83.   In 2022, the United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs found that the BOP's Office of Internal Affairs had, at the time of publication, a backlog of 8,000 allegations of employee misconduct, some pending for over five years.[33]

84.   The BOP did not systematically use the data it had to analyze and prevent sexual abuse of wards, even though the law requires it.[34] "[S]ave for an ad hoc review, BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern."[35]

85.   Though the PREA standards require BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review the data collected to identify problem areas and take corrective action on an ongoing basis," BOP officials admitted they do not analyze complaint data to identify employees who are repeatedly alleged to abuse prisoners, facilities with an outlier number of complaints, or broader system-wise issues."[36]

---

[32] *Press Release, Office of Public Affairs, U.S. Dept. of Justice, Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates, Mar. 22, 2023, https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.*

[33] Staff Report, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.at 4.

[34] *Id.* at 22-23.

[35] *Id*. at 23.

[36] *Id*. at pp. 22-23 (quotations cleaned up).

86.    A 2023 indictment involved the sexual abuse of two prisoners from 2018 through 2019 at Federal Correctional Institution Aliceville, perpetrated by a federal correctional officer.[37]

87.    In 2024, the court in the Dublin class action found that "the Bureau of Prisons has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years."[38]

88.    In deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[39]

89.    The Court made that determination because of the delays in action by the BOP Central Office, including, and especially, Defendant Reese, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[40]

90.    In 2024, a Special Master Report unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI Dublin."[41]

---

[37] Press Release, U.S. Dept. of Justice, Office of the Inspector General, *BOP Correctional Officer Indicted for Sexual Abuse of Inmates*, Apr. 24, 2023, https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-sexual-abuse-inmates.

[38] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (cleaned up).

[39] *Id.* at 736

[40] *Id.*

[41] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

91. The report's findings detailed the failures of the central BOP office, including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[42]

92. The Special Master also found that "Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[43]

93. The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[44]

94. The Special Master also reported that the BOP had "no standard protocol to report violations."[45]

95. The Special Master also noted that the BOP-wide data showed less than a 2% resolution rate for Administrative Remedies, which was "difficult to justify."[46]

96. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault." [47]

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.* at 10.

[47] *Id.*

97.   Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that at that specific facility, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint." [48]

98.   Specific examples included five Dublin class members at Carswell who reported they had tried many times to file PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating officer found no action was warranted, even though policy dictates that it should have been referred to the Office of Internal Affairs.[49]

99.   The Report also found that "Additionally, there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff, at FMC Carswell, regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative level."[50]

100.  In another required report, the Special Master found that PREA Compliance Monitors ("PCMs") at each BOP facility, including specifically Carswell, "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these

---

[48] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 2nd Public Monthly Status Report May 1 - 31, 2025, 55, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf.
[49] *Id*. at 56.

[50] *Id*.

facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[51]

101. On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct."[52] GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[53] While that number includes all employee misconduct allegations, BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[54] Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[55]

102. In short, the long history of the Defendants' mismanagement created the conditions that led directly to H.M., J.P., A.L., K.T., J.G., and C.L. being raped and sexually abused by a BOP staff member who had a history of sexually violating prisoners under his care.

103. This mismanagement existed in the face of binding regulations requiring the contrary.

---

[51] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 1st Quarterly Status Report, March 31 – June 30, 2025, 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf.

[52] Report, https://www.gao.gov/assets/gao-25-107339.pdf.

[53] *Id*., p. 28.

[54] *Id*., p. 43.

[55] *Id*.

104. Binding PREA regulations, which apply across the BOP, mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

105. When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See Id.* § 115.62.

106. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a).

107. The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b).

108. Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83. Defendants had countless opportunities to follow those mandates and stop Franco's misconduct. Franco's actions, including, but not limited to, engaging in frequent sexual abuse of Plaintiffs, as well as the openness with which he used vulgar and sexual language and mannerisms with Plaintiffs, the frequency with which he called over the radio for Plaintiffs, the lack of surveillance in his office, and the frequency with which Franco closed his office door and was alone with prisoners, was obvious, and suspicious for sexual misconduct.

109. Even so, Defendants took no actions to investigate or stop this suspicious and recurrent behavior.

110. Defendants failed to investigate, discipline, supervise, monitor, question, or stop Franco, despite numerous indications of sexual misconduct, including, upon information and belief, from other incarcerated women.

111. This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

112. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face, and is the direct and proximate cause for Plaintiffs' damages.

**BOP ALLOWED DEFENDANT FRANCO UNFETTERED ACCESS TO WOMEN IN HIS CUSTODY, DESPITE NUMEROUS REPORTS AND OVERT AND OBVIOUS SEXUAL CONDUCT**

**A. Defendants permitted Franco to abuse H.M. from 2020 until 2023.**

113. Plaintiff H.M. entered the BOP in 2019 and was transferred to FMC Carswell.

114. At the beginning of 2020, Plaintiff H.M. started working in the biomedical unit, where Franco was the officer-in-charge.

115. This was a coveted job because it paid well and provided Plaintiff H.M. with training and skills that would assist in the job market post-incarceration.

116. Many prisoners sought this job out.

117. Shortly after Plaintiff H.M. began working with Franco, he began being sexually inappropriate.

118. Initially, it started with making inappropriate, sexual jokes to her, progressing into prolonged hugs and groping Plaintiff H.M.'s breasts, buttocks, and legs.

119. One day, shortly after Plaintiff H.M. began working in biomed, Franco invited Plaintiff H.M. into his office, where he forced her to perform oral sex on him.

120. After forcing her to perform oral sex on him, Franco then vaginally penetrated her.

121. Plaintiff H.M. was scared and did not want to, but was terrified about what might happen if she did not comply.

122. After this encounter, Franco began expecting frequent sexual favors from Plaintiff H.M.

123. At this point, he would also bring in outside contraband for Plaintiff H.M., including food, alcohol, and pills.

124. Plaintiff H.M. does not know how he was able to get this contraband into the facility.

125. While officers are allowed to bring in food for personal consumption, alcohol and pills are always prohibited.

126. Had other staff exercised reasonable care, they would have noticed Franco bringing in alcohol and pills.

127. Regardless, Plaintiff H.M. understood these actions to mean that Franco would give them contraband in exchange for sexual favors.

128. In the mornings when she worked, Franco would force Plaintiff H.M. to grope him by touching his penis and manually masturbating him.

129. Over the course of the next month, Franco forced Plaintiff H.M. to perform oral sex on him and vaginally penetrated her over ten more times.

130. When he was not sexually assaulting her, Franco would talk with Plaintiff H.M. about all the guns he owned and would show her photos of them on his computer.

131. Plaintiff H.M. took this as a threat not to report him.

132.   In one instance, Franco sexually assaulted and raped Plaintiff H.M. and Plaintiff J.P. at the same time. During this encounter, Franco forced both Plaintiff H.M. and Plaintiff J.P. to their hands and knees, where he then vaginally penetrated Plaintiff H.M. Afterwards, he forced the women to perform oral sex on him.

133.   Franco regularly talked about how he had previously been investigated, on more than one occasion, but that nothing came from it.

134.   This furthered Plaintiff H.M.'s belief that there was no point in reporting Franco because he had already gotten away with sexually assaulting other women.

135.   At some point after this encounter, Plaintiff H.M. began refusing Franco, and she was fired shortly after.

136.   It became difficult for her to get another job after being fired from this job.

137.   Then, in December 2022, Plaintiff H.M. saw Franco again, where he told her that his whole crew had been fired and that he thought she was great at her job and wanted someone who knew what she was doing.

138.   Plaintiff H.M. agreed to work with him, but told Franco that she did not want it to be how it was before, meaning being forced to engage in sexual acts with him. He agreed and said that it wouldn't be like that again.

139.   In the beginning, he kept his word. He continued being vulgar and would force Plaintiff H.M. into extended hugs, but Plaintiff H.M. was able to tolerate that.

140.   Then, in January 2023, Franco brought Plaintiff H.M. into the dialysis room. When there, he forced Plaintiff H.M. to perform oral sex on him.

141.   Shortly after, Franco propositioned Plaintiff H.M., but she refused, and she was fired in February 2023.

142. In January 2024, along with some of the other Plaintiffs, Plaintiff H.M. came forward to file a PREA report on Franco and spoke with the Office of the Inspector General.

143. During the times that Plaintiff H.M. worked in biomed for Franco, she heard from other prisoners about the rumors going around FMC Carswell about Franco.

144. These rumors included that he was sexually assaulting the women in biomed.

145. Upon information and belief, officers were aware of these rumors, but failed to properly investigate or act to prevent further abuse.

146. Given the obviousness with which Franco sexually abused Plaintiff H.M., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

147. PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct.

148. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

149. Defendants' acts caused Plaintiff H.M. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

150.  Plaintiff H.M. is a survivor of childhood sexual abuse and sexual abuse in adulthood. The rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

151.  She spiraled into a deep depression, facing constant anxiety, nightmares, and insomnia. She did not know how to maneuver through everything, and continues to struggle with the effects of this trauma today.

152.  The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff H.M. from foreseeable assaults.

153.  Upon information and belief, Plaintiff H.M. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff H.M.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**B. Defendants permitted Franco to abuse J.P. from 2020 to 2021.**

154.  Plaintiff J.P. arrived in the BOP in 2017 and was immediately sent to FMC Carswell.

155.  When she arrived at FMC Carswell, Plaintiff J.P. took a job in plumbing.

156.  A friend of hers worked in biomed, and told Plaintiff J.P. that there was a job opening.

157.  Plaintiff J.P. was excited about the biomed job; she heard it was one of the hardest jobs to get because it paid well and provided skills that she could take with her when she left prison.

158.  In December 2019, Plaintiff J.P. began working in biomed.

159.  At this point, Plaintiff J.P. had heard rumors about Franco being inappropriate with women.

160.  Franco had only been friendly to her and hadn't begun making sexual jokes or using vulgar language.

161.  Plaintiff J.P. believed at this point that she could manage the situation so that she would not be abused herself.

162.  Slowly, however, Franco began talking with her every morning, telling her about his personal life, including his sex life.

163.  Plaintiff J.P. began to notice that Franco would call her friend to his back office, and they would laugh and talk, and then he would close the door.

164.  Plaintiff J.P. felt like this was weird and suspicious, but did not know for sure that Franco was sexually assaulting her friend.

165.  Shortly after one of these instances, Plaintiff J.P.'s friend told her that Franco was sexually assaulting her and that he would bring in pills, alcohol, and outside food for them.

166.  Their interactions made Plaintiff J.P. uncomfortable, but it was the first time she had witnessed something like this within the BOP, and she didn't think there was anything she could do.

167.  She tried to ignore those comments.

168.  Franco began bringing in pills, alcohol, and outside food for Plaintiff J.P. and regularly insinuated that he expected her to provide sexual favors.

169.  Plaintiff J.P. does not know how Franco was able to bring in pills and alcohol through security.

170. Had other staff exercised reasonable care, they would have noticed Franco bringing in alcohol and pills.

171. Franco's sexual comments began to increase. He would tell Plaintiff J.P. how beautiful she was and that he wanted to be her pimp.

172. In one particular instance, Franco put his hand on her thigh and rubbed her. This made Plaintiff J.P. incredibly uncomfortable, but she was in shock and did not know what to do.

173. At some point in February 2020, Franco brought Plaintiff J.P. and another prisoner into his back office, where he gave them both cough syrup.

174. Franco told both women that they were beautiful and deserved better lives.

175. Plaintiff J.P. left the office, but later learned that Franco sexually assaulted her friend after she left.

176. Later that month, Franco brought Plaintiff J.P. alone to his office and led her to the back room near his office.

177. He then forced Plaintiff J.P. to perform oral sex on him.

178. Plaintiff J.P. felt like she had no choice and could not say no to him.

179. Franco forced her to perform oral sex on him at least two more times and manually masturbate him several additional times.

180. One time he was sitting in his chair in his office with Plaintiff J.P. and another prisoner. He ordered Plaintiff J.P. to go into the back room with him, where he then forced her to manually masturbate him, saying that she "didn't need to put her lips on it this time."

181. In another instance, Franco forced Plaintiff J.P. and another prisoner into his back room. While there, he forced Plaintiff J.P. to pull her pants down. Franco was about to vaginally penetrate her, but he stopped, telling her that she was shaking too badly.

182. After these encounters, she began feeling disgusted about herself, and her self-worth plummeted.

183. She started avoiding Franco and was able to avoid his continued sexual advances.

184. Plaintiff J.P. felt that she could not come forward to report Franco because he had been there for so long and knew that other officers had his back and would defend him.

185. Franco would also regularly tell Plaintiff J.P. that he had previously been investigated for a PREA, but that nothing came from it, and the woman who reported him lost her job and reputation, and faced regular retaliation by officers.

186. She believed that if she were to come forward, no one would believe her and that she would be retaliated against.

187. At the end of 2021, Plaintiff J.P. quit her biomed job as she believed Franco would start retaliating against her because she refused him.

188. A separate officer came to her shortly after, requesting that she take the job back because they needed employees who were skilled at fixing the dialysis machine.

189. Upon information and belief, a reasonable officer should have been concerned with the turnover at this job.

190. She took the job back, but was able to avoid Franco's continued sexual advances.

191. In 2022, Plaintiff J.P. was transferred to FCI Aliceville.

192. After Plaintiff J.P. worked in biomed for Franco, she heard from other prisoners about the rumors going around FMC Carswell about Franco.

193. These rumors included that he was sexually assaulting the women in biomed.

194. Upon information and belief, officers were aware of these rumors, and should have seen him closing his office door, and regularly flirting and being sexually inappropriate with

prisoners, had they exercised reasonable care, but they failed to properly investigate or act to prevent further abuse.

195. Given the obviousness with which Franco sexually abused Plaintiff J.P., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

196. PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct.

197. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

198. Defendants' acts caused Plaintiff J.P. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

199. Plaintiff J.P. is a survivor of childhood sexual abuse and the sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

200. She spiraled into a deep depression, faced low self-worth and insecurity, and suffered from anxiety.

201. Additionally, as a result of this sexual trauma, she was no longer able to comfortably have sex with her husband, which was a significant factor that led to their ultimate divorce.

202. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff J.P. from foreseeable assaults.

203. Upon information and belief, Plaintiff J.P. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff J.P.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

### C. Defendants permitted Franco to abuse A.L. in 2021, then again from 2022 to 2023.

204. Plaintiff A.L. arrived in the BOP in October 2019 and was sent directly to FMC Carswell.

205. Shortly after arriving at FMC Carswell, she was sent out to the county, during the height of the COVID pandemic, where Plaintiff A.L. stayed for nearly 18 months, before coming back to FMC Carswell.

206. In September 2021, after arriving back at FMC Carswell, Plaintiff A.L. interviewed with Franco for a job in biomed.

207. During the interview, Franco was flirty and used vulgar language. Franco asked her questions about her personal relationships and sex.

208. Plaintiff A.L. had long heard rumors that he was a pervert, but the biomed job was the most sought-after job on the compound because it paid well, and she was able to learn new skills for her release. She felt as if she needed this job to secure enough money while she was incarcerated and to help her gain additional skills.

209.  Within a few weeks after Plaintiff A.L. began working for Franco, he called her into his office, where it was just the two of them.

210.  He began talking explicitly and aggressively about sex.

211.  Then, Franco forced Plaintiff A.L. to perform oral sex on him.

212.  Shortly after, Plaintiff A.L., unrelatedly, was given a Segregated Housing Unit ("SHU") sentence and lost her job.

213.  After serving her SHU sentence, Plaintiff A.L. got a job in the kitchen. She made less money, and it was harder work.

214.  Then, in November 2022, Franco sought Plaintiff A.L. out and rehired her.

215.  Although Plaintiff A.L. was uncomfortable, she needed the money from this job and also feared possible retaliation from Franco if she didn't take it.

216.  After she began working in November 2022, however, Franco's sexual abuse drastically increased.

217.  Franco required Plaintiff A.L. to perform oral sex on him whenever he demanded it, amounting to at least once or twice a week.

218.  He would call Plaintiff A.L. into a separate room in the back of his office, where he would force her to perform oral sex on him.

219.  Plaintiff A.L. was reluctant, but felt like she had no choice or ability to say no in the matter.

220.  Franco regularly brought in alcohol, outside food, and pills.

221.  Plaintiff A.L. understood this to mean that he was bringing in contraband in exchange for sexual favors.

222. Plaintiff A.L. does not know how Franco was able to bring in pills and alcohol through security.

223. Had other staff exercised reasonable care, they would have noticed Franco bringing in alcohol and pills.

224. Over the course of the next five months, Franco would also show Plaintiff A.L. videos of him at a shooting range and photographs of the many different guns he owned.

225. He told Plaintiff A.L. that he had a "kill kit" that he was ready to use.

226. Franco also told Plaintiff A.L. that he had previously been investigated for PREA reports, but that nothing came from it.

227. Plaintiff A.L. believed that no one would believe her if she were to report him and that he might physically hurt her if she did decide to come forward.

228. Around March 2023, Franco called Plaintiff A.L. and Plaintiff C.L. into his back office.

229. When there, Franco forced both Plaintiff A.L. and Plaintiff C.L. to perform oral sex on him at the same time. Thereafter, Franco forced Plaintiff A.L. to turn around and bend over, where he then vaginally penetrated her with his penis.

230. In May 2023, Plaintiff A.L. was again written up and sentenced to the SHU, on an unrelated charge.

231. When she was released from the SHU, Plaintiff A.L. had heard rumors that Franco had been walked off FMC Carswell.

232. Upon hearing this, she felt safe enough to come forward, and she reported Franco and was interviewed by the Officer of the Inspector General.

233. During the times that Plaintiff A.L. worked in biomed for Franco, she heard from other prisoners about the rumors going around FMC Carswell about Franco.

234. These rumors included that he was sexually assaulting the women in biomed.

235. Additionally, Franco had intentionally rigged a doorbell on the door entering the basement, where biomed was located. Whenever an officer or staff member would open the door, it would alert Franco that there was someone in the basement, giving him enough time to stop sexually abusing Plaintiff A.L.

236. Upon information and belief, officers were aware of these rumors and would have noticed the out-of-the-ordinary rigging of the bell, but failed to properly investigate or act to prevent further abuse.

237. Given the obviousness with which Franco sexually abused Plaintiff A.L., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

238. Additionally, upon information and belief, the basement where biomed was located had no surveillance cameras, which was atypical for job facilities within FMC Carswell and within BOP as a whole.

239. Upon information and belief, officers were aware of these rumors and should have seen Franco closing his office door and regularly flirting and being sexually inappropriate with prisoners, had they exercised reasonable care, but they failed to properly investigate or act to prevent further abuse.

240. PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct.

241. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

242. Defendants' acts caused Plaintiff A.L. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

243. Plaintiff A.L. is a survivor of childhood sexual abuse and the rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

244. She spiraled into a deep depression, facing constant anxiety and nightmares. She is terrified of all other BOP officers and feels unsafe and unprotected.

245. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff A.L. from foreseeable assaults.

246. Upon information and belief, Plaintiff A.L. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff A.L.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**D. Defendants allowed Franco to abuse K.T. in 2022.**

247. Plaintiff K.T. entered the BOP in November 2017 and was immediately sent to FMC Carswell.

248. Because of Plaintiff K.T.'s educational background and experience, she immediately received a job as a tutor.

249. In early to mid-2022, Plaintiff K.T.'s friend told her about an opening in biomed.

250. Plaintiff K.T. was excited about the biomed job because it paid more money and was overall a more desirable job. She understood that in order to get the job, you needed to know someone who already worked there.

251. Plaintiff K.T. had an interview with Franco shortly after and was immediately hired.

252. During the interview, Franco was professional with Plaintiff K.T.

253. However, within the first week, Franco called Plaintiff K.T. into his office.

254. He told her about what she would be responsible for and other expectations of the job, then he told her that, "Your responsibility is to keep my ass in this chair and my dick wet, is that going to be a problem?"

255. Plaintiff K.T. was uncomfortable, but laughed it off and left the office.

256. During the next several weeks, Franco would routinely pull Plaintiff K.T. into his office and make comments about what she would be willing to do to maintain this job.

257. He would point to her mouth, vagina, and butt, asking her if she would be okay with "it" going there, suggesting putting his penis in any of the places he pointed.

258. Plaintiff K.T. was uncomfortable during these encounters, but was fearful of what Franco might do and worried she might be retaliated against.

259. She also wanted to maintain this job because it paid well and gave her flexibility and new skills.

260. One of the next times Franco pulled Plaintiff K.T. into his office, he made her go into the back room adjacent to his office.

261. Franco led Plaintiff K.T. to the couch in this room and told her he needed to pat her down.

262. During this pat down, however, Franco groped Plaintiff K.T.'s breasts and ran his hands over her genitalia and buttocks. He then spanked her.

263. Franco pulled Plaintiff K.T. into his office at least three other times where the same interaction transpired: Franco groped Plaintiff K.T.'s breasts, genitalia, and buttocks.

264. During one of these occasions, Franco forced Plaintiff K.T. to put her hand on his penis and begin to manually masturbate him.

265. After these interactions, Franco became pushier with Plaintiff K.T. to have sex with him.

266. Plaintiff K.T. kept trying to make jokes and otherwise distract Franco.

267. She was terrified to outright say "no," because of the potential retaliation she had seen other women at FMC Carswell experience.

268. Ultimately, six months after Plaintiff K.T. began working in biomed, Franco fired her.

269. Plaintiff K.T. did not receive any disciplinaries or reasons for the firing.

270. Because of the abruptness and Franco's persistence in sexually assaulting Plaintiff K.T., she believes she was fired because she would not engage in further sexual relationships with Franco.

271. Defendants and their agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Franco, despite numerous indications of sexual misconduct, including, upon information and belief, from other incarcerated women.

272. This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

273. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

274. Defendants' acts caused Plaintiff K.T. severe mental and emotional harm and exacerbated all of her already underlying mental health diagnoses.

275. Plaintiff K.T. grew increasingly more anxious and distrustful and believed that Franco targeting her was her fault. As a result, her self-worth plummeted.

276. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff K.T. from foreseeable assaults.

**E. Defendants allowed Franco to abuse J.G.**

277. Plaintiff J.G. arrived in BOP custody 2014 and went straight to FMC Carswell. She was housed at FMC Carswell until 2023, when she was transferred to FCI Waseca.

278. Like most of the other plaintiffs, Plaintiff J.G. heard rumors about Franco being a "pervert."

279. But when she heard there was a job opening in biomed in the fall of 2022, she was eager to take it because it was one of the best-paying jobs in the BOP, and it would provide her with skills for after her release from incarceration.

280. During the interview, Franco told Plaintiff J.G. that it was her job to "make sure my dick stays wet."

281. Although Plaintiff J.G. was uncomfortable, she thought she would be able to avoid Franco's advances, and really needed the money from this job.

282. Initially, Franco would make sexual comments and innuendos to Plaintiff J.G. He would tell her that he wished he knew her back in her college days and that when he retired, he wanted to open a sex business and have Plaintiff J.G. work for him.

283. Franco would regularly bring in pills, alcohol, and outside food that he would give the women in biomed.

284. Plaintiff J.G. does not know how Franco was able to bring in pills and alcohol through security.

285. Had other staff exercised reasonable care, they would have noticed Franco bringing in alcohol and pills.

286. In November 2022, Franco called Plaintiff J.G. into his office.

287. He was sitting in the back room adjacent to his office. When she entered, Franco told her to sit on his desk, right next to where he was sitting at the desk.

288. He then told Plaintiff J.G. to spread her legs. Plaintiff J.G. was uncomfortable, but was terrified to say no or otherwise refuse.

289. Franco then proceeded to rub Plaintiff J.G.'s genitalia and forced her to rub his penis.

290. During their conversations, Franco regularly told Plaintiff J.G. that he had previously been investigated for a PREA, but that nothing came from it. He told her that if she were to report him, no one would believe her either.

291. Plaintiff J.G. believed that no one would believe her and that she would instead be punished and retaliated against.

292.  Finally, Plaintiff J.G. came forward after several Office of Internal Affairs officers approached her after other women had given them her name.

293.  Although she did report Franco at this point, she was terrified about the retaliation she would experience.

294.  During the times that Plaintiff J.G. worked in biomed for Franco, she heard from other prisoners about the rumors going around FMC Carswell about Franco.

295.  These rumors included that he was sexually assaulting the women in biomed.

296.  Upon information and belief, officers were aware of these rumors, but failed to properly investigate or act to prevent further abuse.

297.  Given the obviousness with which Franco sexually abused Plaintiff J.G., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

298.  Upon information and belief, officers were aware of these rumors, and should have seen him closing his office door and regularly flirting and being sexually inappropriate with prisoners, had they exercised reasonable care, but they failed to properly investigate or act to prevent further abuse.

299.  PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct

300.  This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants,

contractors, and employees towards the risk of sexual abuse that incarcerated women face.

301. Defendants' acts caused Plaintiff J.G. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

302. Plaintiff J.G. is a survivor of childhood sexual abuse and the sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

303. Plaintiff J.G. began suffering from anxiety, closing herself off to others, and blacking out for extended periods of time.

304. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff J.G. from foreseeable assaults.

305. Upon information and belief, Plaintiff J.G. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff J.G.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**F. Defendants allowed Franco to abuse C.L. beginning in 2022.**

306. Plaintiff C.L. was another woman housed at FMC Carswell.

307. At the end of 2022, Plaintiff C.L. started her job at biomed.

308. Plaintiff C.L. was eager to have this job because of how well it paid and because of the prestige it provided at FMC Carswell.

309. Although she had heard that Franco was flirty and a "pervert," she believed she could handle it.

310. However, Franco's flirtation escalated into sexual assaults shortly after Plaintiff C.L. began working for him in 2022.

311. The week before Christmas 2022, Franco called Plaintiff C.L. into his office.

312. When Plaintiff C.L. entered Franco's office, he went to the door and locked the door.

313. He then forced Plaintiff C.L. to perform oral sex on him.

314. Plaintiff C.L. was incredibly uncomfortable and did not know what to do, but did not believe she could say no.

315. Plaintiff C.L. left that day feeling a lot of shame and embarrassment.

316. From there, however, Franco's constant sexual abuse only intensified.

317. From the beginning of 2023, for the next five months, Franco would force Plaintiff C.L. to perform some sexual conduct on him every day that they worked together.

318. Franco would vaginally penetrate Plaintiff C.L., force her to perform oral sex on him, and/or manually masturbate him daily, Monday through Thursday.

319. In at least one instance, Franco used his thumb to penetrate Plaintiff C.L. in the anus.

320. In another instance in 2023, Franco forced Plaintiff C.L. and Plaintiff A.L. to both come into his office, where he then forcibly vaginally penetrated both Plaintiff C.L. and Plaintiff A.L.

321. During the course of the daily sexual abuse, Franco would also physically abuse Plaintiff C.L.

322. He would regularly choke Plaintiff C.L. and hit her.

323. She would often have bruises on her body, face, and neck, requiring her to wear makeup to try to cover them.

324. On information and belief, these bruises were visible to other staff members.

325. Franco would also force her to wear makeup to work and then force her to use his penis to rub the makeup off her face.

326. On June 1, 2024, the day that Franco was walked off FMC Carswell, he forced Plaintiff C.L. to perform oral sex on him in the morning, and then again later that afternoon.

327. Plaintiff C.L. understood that if she were to have come forward, she would not have been believed, and that she would face serious retaliation for reporting Franco.

328. Franco showed Plaintiff C.L. satellite images of her family's home and photographs of the guns he had in his possession.

329. Plaintiff C.L. believed that if she were to report Franco, he might harm her family since he knew where they lived.

330. Franco would also regularly tell Plaintiff C.L. that he had a "kill bag," full of various guns, and that he would "eat a bullet" before going to prison.

331. Franco told Plaintiff C.L. on more than one occasion that he had previously been investigated for a PREA, but that nothing came from the investigation, and no one would believe her if she were to report him.

332. During the time that Franco was sexually assaulting Plaintiff C.L., he would regularly call over the radio for 2 North, the housing unit Plaintiff C.L. was housed in, to send Plaintiff C.L. down to his office.

333. This happened frequently and in a manner that should have raised suspicion with other staff at FMC Carswell.

334. During the times that Plaintiff C.L. worked in biomed for Franco, she heard from other prisoners about the rumors going around FMC Carswell about Franco.

335. These rumors included that he was sexually assaulting the women in biomed.

336. Franco would regularly bring in outside food, alcohol, and pills.

337. Plaintiff C.L. does not know how Franco was able to bring in pills and alcohol through security.

338. Had other staff exercised reasonable care, they would have noticed Franco bringing in alcohol and pills.

339. Additionally, Plaintiff C.L. witnessed Franco cutting wires that were in the ceiling of his office. Plaintiff C.L. believed these wires connected to possible surveillance video.

340. Upon information and belief, officers were aware of these rumors and should have noticed the loss of surveillance video or sound in his office, but failed to properly investigate or act to prevent further abuse.

341. Given the obviousness with which Franco sexually abused Plaintiff C.L., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

342. Upon information and belief, officers were aware of these rumors, and should have seen him closing his office door and regularly flirting and being sexually inappropriate with Plaintiff C.L., had they exercised reasonable care, but they failed to properly investigate or act to prevent further abuse.

343. Given the obviousness with which Franco sexually abused Plaintiff C.L., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

344. PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct.

345. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

346. Defendants' acts caused Plaintiff C.L. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

347. Plaintiff C.L. is a survivor of childhood sexual abuse and the rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

348. She spiraled into a deep depression and has struggled with sleeping and frequent nightmares. She has a hard time eating and has lost weight since this abuse. She is terrified of all other BOP officers and feels unsafe and unprotected.

349. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff C.L. from foreseeable assaults.

350. Upon information and belief, Plaintiff C.L. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with

such professional treatment, it is expected that Plaintiff C.L.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

## EXHAUSTION

351. Plaintiffs have properly complied with 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America. The Claims were timely filed within two years of the accrual of the causes of action, at the date at which each plaintiff reported the abuse.

352. Plaintiff H.M. filed her Administrative Claim on October 31, 2024, and BOP acknowledged receipt on November 6, 2024.

353. Plaintiff J.P. filed her Administrative Claim on November 13, 2024, and BOP did not acknowledge receipt.

354. Plaintiff A.L. filed her Administrative Claim on October 31, 2024, and BOP acknowledged receipt on November 6, 2024.

355. Plaintiff K.T. filed her Administrative Claim on July 28, 2025, and BOP denied her claim on August 23, 2025.

356. Plaintiff J.G. filed her Administrative Claim on October 31, 2024, and BOP acknowledged receipt on November 6, 2024.

357. Plaintiff C.L. filed her Administrative Claim on October 31, 2024, and BOP acknowledged receipt on November 6, 2024.

358. BOP denied N.H.'s Administrative Claim on January 15, 2025.

359. BOP denied A.G.'s Administrative Claim on April 17, 2025.

360. Therefore, Plaintiffs have exhausted the requisite FTCA administrative exhaustion.

## K.T.'S CLAIMS ARE ENTITLED TO EQUITABLE TOLLING

361. FTCA claims must be presented within two years of accrual pursuant to 28 U.S.C. §
2401(b).

362. However, FTCA claims are entitled to equitable tolling, thereby extending the statute of
limitations, on a case-by-case basis, in order to prevent inequity.[56]

363. A plaintiff must demonstrate that 1) there was some extraordinary circumstance that
stood in her way; and 2) she has been pursuing her rights diligently since.[57]

364. Fear of retaliation, particularly in a context where officers exercise total control over
prisoners, amounts to an extraordinary circumstance meriting equitable tolling.[58]

365. Officers exercise total control over prisoners' lives, and there are further psychological
consequences that go along with that level of control.[59]

366. Plaintiff K.T. feared Franco, who had demonstrated aggression and whom she had seen
retaliate against other prisoners.

367. Plaintiff K.T. had witnessed other women report officers for sexual abuse and be sent to
the SHU.

368. Placement in the SHU could mean loss of privileges, including not being able to use the
phone or tablet to talk to loved ones on the outside, not being able to go outside, not

---

[56] *United States v. Wong*, 575 U.S. 402, 412 (2015); *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir.
2000)
[57] *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023) (citing *A.Q.C. ex rel. Castillo v. United
States*, 656 F.3d 135, 144 (2d Cir. 2011))
[58] *Gabbidon v. Wilson*, CIVIL ACTION NO. 1:19-00828, 2021 U.S. Dist. LEXIS 29499, at *21
(S.D.W. Va. Feb. 17, 2021)
[59] *Id.* ((citing *Davis v. Jackson*, 2016 U.S. Dist. LEXIS 136034 *32-33 (S.D.N.Y. Sept. 30, 2017)
(describing the psychological effects of being totally controlled through imprisonment and the
fear of retaliation as a result)).

being able to have regular showers, and not accessing commissary and other food and hygiene items.

369. District courts could reasonably conclude that Plaintiff K.T. suffered extraordinary circumstances preventing her from reporting the abuse in a timely manner.

370. As noted previously, retaliation and threat of retaliation prevent prisoners from coming forward and amount to extraordinary circumstances preventing earlier reporting.[60]

371. Plaintiff K.T. found counsel as soon as she was reasonably able.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

372. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

373. At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, undertook and endeavored to, and did provide custodial care to people incarcerated at FMC Carswell, including, but not limited to, the Plaintiffs.

374. At all relevant times, Defendant United States acted negligently in its indifference to Plaintiffs' safety.

---

[60] *See Doe*, 76 F.4th 64 (holding that Plaintiff was entitled to equitable tolling where she had been sexually abused by an officer and had failed to report the abuse within two years)

375. At all relevant times, Defendant United States hired correctional and administrative employees at FMC Carswell, including Officer Franco, as well as colleagues and supervisors of Officer Franco whose identities are currently unknown to Plaintiff.

376. At all relevant times, Defendant United States's employees were acting within the scope of their employment, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision of Plaintiffs.

377. At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and act in accordance with standards of reasonable care common and acceptable in the community.

378. At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FMC Carswell, owed a duty to Plaintiffs while they were at FMC Carswell.

379. It is Defendant United States's duty to maintain, operate, and control FMC Carswell as a safe and secure space for persons in it, including, but not limited to, Plaintiffs.

380. In addition to a custodial duty owed to Plaintiffs, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by H.M., J.P., A.L., K.T., J.G., and C.L.

381. Defendant United States should have known that Officer Franco had a propensity to sexually abuse inmates, due to past rumors and disciplinaries received at FMC Carswell.

382. Defendant United States should have known that Officer Franco acted inappropriately with prisoners under his care at FMC Carswell.

383.    Defendant United States was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through the above-mentioned investigations, articles, lawsuits, and reports.

384.    As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiffs and others under their control.

385.    Despite actual and constructive notice of Officer Franco's abuse, agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiffs, and to ensure their safety, in violation of federal regulations and BOP protocols.

386.    Despite actual and constructive notice of Officer Franco's abuse, Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

387.    Due to actual and constructive notice of Officer Franco's abuse, Defendant United States knew of or should have known of the risk posed to Plaintiffs and other prisoners that they would be sexually assaulted by employees such as Officer Franco.

388.    Despite actual and constructive notice of Officer Franco's abuse, Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras, the rigging of doorbell systems, and the availability of unmonitored and isolated spaces in the facility for which male officers could be alone with female prisoners.

389.    Due to Defendant United States's herein described acts and omissions, it breached its duty to protect Plaintiffs and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees, including Officer Franco.

390.  Agents, servants, contractors, and/or employees of the United States did not possess the necessary skills to maintain a safe and secure environment and protect Plaintiffs from foreseeable harm.

391.  Agents, servants, contractors, and/or employees of the United States neglected to apply the skills they did have.

392.  Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skills they had.

393.  Agents, servants, contractors, and/or employees of the United States mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

394.  Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiffs.

395.  The failure of FMC Carswell personnel to prevent, investigate, or acknowledge Officer Franco's sexual abuse served no legitimate policy purpose. On the contrary, FMC Carswell staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

396.  Plaintiffs' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to

hire, retain, and promote BOP personnel who were suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures rather than providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

397. Defendant United States's above-described acts and omissions were a direct and proximate cause of Plaintiffs' injuries and damages herein.

## COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

398. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

399. The above-described acts and omissions of FMC Carswell personnel, acting as an agent of Defendant United States, constituted extreme and outrageous conduct.

400. Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused or disregarded a substantial probability of causing severe emotional distress to Plaintiffs.

401. Defendant United States of America was negligent in its oversight and administration of FMC Carswell, which was a direct and proximate cause of Plaintiffs' injuries.

402. The acts and omissions of Defendant United States, described above, physically endangered Plaintiffs and caused their injuries through the sexual abuse they suffered, and caused debilitating emotional suffering. These acts and omissions constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

403. Under the FTCA, Defendant United States is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment.

404. As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

405. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

406. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

407. Defendant United States's acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. severe emotional distress following sexual abuse they experienced.

408. Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or were recklessly indifferent to the probability of causing, Plaintiffs' severe emotional distress.

409. Plaintiffs, in fact, suffered debilitating emotional suffering. Their emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

410. Officer Franco engaged in extreme and outrageous conduct through violently raping and sexually abusing H.M., J.P., A.L., K.T., J.G., and C.L. while they were incarcerated and entirely under the care and control of Defendant United States. He intended to cause them severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused them while he was supposed to be providing custodial care.

411. At all relevant times, Officer Franco was acting within the scope of his employment at FMC Carswell and used his authority as a member of the facility's correctional staff to sexually assault Plaintiffs, while Plaintiffs did not have the ability to consent or withhold consent.

412. Plaintiffs' injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Officer Franco. Under 28 U.S.C. § 2680(h), Defendant United States is

liable for the intentional torts committed by Officer Franco, and his abuse of his position of authority as a correctional officer, within the scope of his employment and under color of federal law.

413. At all relevant times, Defendants United States individually or through its agents, servants, contractors, and/or employees, including Officer Franco, were acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h). At all relevant times, Officer Franco supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned Plaintiffs within the scope and course of his employment with Defendant United States. All BOP employees are charged with maintaining security of the institution, and staff's correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

414. At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees, including Officer Franco, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault Plaintiffs and to prevent them from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, and additional assaults, among others.

415. Defendant United States is vicariously liable for the intentional torts committed upon Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. Thus, Plaintiffs bring this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers, including Officer Franco.

416. As a result of FMC Carswell personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

417. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

### COUNT IV – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

418. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

419. Officer Franco committed sexual battery on Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. It was impossible for Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

420. Officer Franco acted within the scope of his authority and employment as a federal employee in the administrative unit at FMC Carswell.

421. Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. reasonably believed that Officer Franco was in a position of control or authority, and they did not have the ability to consent or not consent to sexual acts that he initiated.

422. With the intent to cause harmful or offensive contact, Officer Franco subjected Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. to sexual acts to which they could not consent. These acts were deeply offensive to their personal dignity and would offend a person of ordinary sensitivity.

423. These above-described acts and omissions were a direct and proximate cause of Plaintiffs' serious physical and emotional harm.

424. As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

425. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

426. Defendant United States of America is liable for the intentional torts committed by Officer Franco and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT V – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

427. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

428. Plaintiffs bring this Claim under the FTCA for sexual assault against Defendant United States, based on the conduct of its officers, including Officer Franco.

429. Officer Franco subjected Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. to sexual acts with the intent to cause harmful or offensive contact. His intentional torts caused Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. physical and emotional injuries, and Defendant United States is liable for intentional torts perpetrated by its agents within the scope of their employment.

430. It was impossible for Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

431. Officer Franco acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

432. Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. reasonably believed that Officer Franco was in a position of control or authority, and that they did not have the ability to consent or not consent to sexual acts that he initiated.

433. As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

434. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

435. Defendant United States is liable for the intentional torts committed by Officer Franco and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT VI – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

436. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

437. Defendant United States hired Officer Franco and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over prisoners such as Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.

438.  Defendant United States knew that potential abusers such as Officer Franco would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

439.  Defendant United States failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.

440.  Defendant United States had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the reports mentioned above and lawsuits.

441.  Defendant United States's knowledge of prior sexual abuse at FMC Carswell, as well as that specifically by Officer Franco, placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.

442.  If Defendant United States had properly supervised employees, facility staff such as Officer Franco would not have been able to sexually abuse prisoners.

443.  If Defendant United States of America had conducted thorough investigations of reported employees, Officer Franco would not have been able to continue sexually abusing prisoners, including Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.

444.  If Defendant United States of America had tracked reports or data of reported employees, Officer Franco would not have been able to continue sexually abusing prisoners, including Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L.

445.    Defendant United States was also negligent in allowing employees it knew had
previously committed sexual abuse to continue to safeguard and monitor a female
population of prisoners.

446.    If Defendant United States of America had properly supervised and investigated
employees such as Officer Franco and his supervisors, it would have learned of his
propensity to commit sexual abuse.

447.    The above-described acts and omissions were a direct and proximate cause of Plaintiffs'
serious physical and emotional harm.


**COUNT VII - TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
("TVPRA"), 18 U.S.C. § 1581, *et seq.*
(AGAINST DEFENDANT REESE)**

448.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding
paragraphs as if fully set forth above.

449.    Congress passed the Trafficking Victims Protection Act and subsequent reauthorization
acts ("TVPA") to combat domestic human trafficking.

450.    TVPA is a comprehensive statutory framework imposing both criminal and civil liability,
*see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual
exploitation and labor trafficking or obstructing anti-trafficking enforcement.

451.    The TVPA makes liable anyone who attempts to, conspires to, or actively "recruits,
entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits
by any means a person; or . . . benefits, financially or by receiving anything of value,
from participation in a [trafficking] venture" while knowing "that means of force, threats
of force, fraud, coercion . . . will be used to cause the person to engage in a commercial
sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

452.  "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

453.  "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

454.  The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

455.  A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

456.  Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means:

    a.  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.  by means of serious harm or threats of serious harm to that person or another person;

    c.  by means of the abuse or threatened abuse of law or legal process; or

d.  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

457. The TVPA makes liable anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589(b).

458. The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

459. The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(12).

460. The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section." 18 U.S.C. § 1591(d).

461. The TVPA allows for civil liability as set forth in 18 U.S.C. § 1595(a).

462. An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees. 18 U.S.C. § 1595(a).

463. Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).

464. Franco knowingly recruited, enticed, and solicited Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. by offering benefits and things of value, such as alcohol, pills, and other contraband, for engaging in sex acts.

465. Franco made Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. engage in sex acts through force and coercion.

466. Defendant Reese, as Chief of the Office of Internal Affairs, knew or should have known that Officer Franco had engaged in commercial sex acts with the Plaintiffs in violation of the TVPA, and had a duty to protect prisoners, such as Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L., from reasonably foreseeable predators such as Officer Franco.

467. By her acts and omissions in failing to meet these duties, Defendant Reese benefited through continued employment.

468. Defendant Reese participated in a venture and facilitated the harboring and transportation of Plaintiffs for purposes of sex induced by force, fraud, or coercion.

469. Defendant Reese benefitted financially through continuing employment and advancement when she, through her own actions and those she directed in her office, ignored the

conditions, failed to make appropriate and necessary changes that directly led to Officer

Franco's persistent abuse, and otherwise benefited from facilitating this behavior that

kept him in his role on the facility's medical staff.

470. This conduct has caused Plaintiffs serious harm, including, without limitation, physical,

psychological, emotional, financial, and reputational harm, and they have a claim for

damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.


## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, and each of them, as follows:

471. An award of compensatory, punitive, and nominal damages to each named Plaintiff in an

amount to be determined at trial;

472.  An award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and

litigation expenses; and

473. For such other and further relief as this Court may deem just and proper.

Dated: November 26, 2025

Respectfully submitted by,


*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470-578
bex kolins
DC Bar # 90035779
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com